## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIANA F. SARRAF, 1390 V Street NW, Washington, DC 20009, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) Case No. _____ |
| vs. | ) ) ) JURY TRIAL DEMANDED |
| UNIVERSAL MUSIC GROUP, INC.; SONY CORPORATION OF AMERICA; BERTELSMANN MUSIC GROUP; SONY BMG MUSIC ENTERTAINMENT; EMI GROUP PLC; WARNER MUSIC GROUP CORP., | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Kiana F. Sarraf ("Plaintiff"), on behalf of herself and all others similarly situated, by and through counsel, hereby alleges as follows:

### INTRODUCTION

1.     Defendants Universal Music Group, Inc., Sony Corporation of America, Bertelsmann Music Group, EMI Group PLC, Warner Music Group Corp., and Sony BMG Entertainment (collectively referred to herein as the "Major Labels" or Defendants) together hold copyrights to at least 85% of digital music recordings.

2.     The Major Labels used their dominant positions as copyright holders to delay the creation of an online market for the purchase of digital music downloads ("Online Music") in order to protect the profits they earned on compact discs ("CDs").

Once it became apparent that they could no longer forestall the online market, the Major Labels engaged in a combination and conspiracy to fix, raise, maintain, and stabilize the royalty rates they charge for Online Music.

3.     Through the use of "most favored nation" clauses ("MFN clauses"), the Major Labels have collectively set royalty rates charged to services licensing Online Music for purchase such as iTunes Music Store, MusicMatch, Napster, Yahoo, Rhapsody, etc. ("Online Music Retailers") at approximately 65 cents per download. The royalty of approximately 65 cents translates to a 99 cent retail price, which is roughly the same as, or slightly higher than, the cost per song on a CD. This price ensures that the Major Labels will earn supra-competitive royalties on legal downloads and also ensures consumers are unlikely to be lured away from CDs, thereby enabling the Major Labels to similarly charge supra-competitive prices on CDs.

4.     This action is brought by Plaintiff on behalf of a class of persons and entities that have been forced indirectly to pay artificially-inflated, non-competitive royalties to the Major Labels on their purchases of Online Music and CDs from April 27, 2002 to the present ("Class Period"). Defendants' conduct violates, *inter alia*, federal and state antitrust statutes and state common laws of unjust enrichment. Plaintiff seeks injunctive relief and damages for herself and the class as a result of the Major Labels' unlawful conduct.

## JURISDICTION AND VENUE

5.     Jurisdiction is conferred upon this judicial district pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 and 28 U.S.C. § 1331 and 1337.

2

6.    The Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and which some members of the proposed class are citizens of a different state than of a defendant.

7.    Venue is proper pursuant to 28 USC § 1391(a) because Defendants transact business in this district, and because thousands of class members are located in this district.  Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this district.  The acts complained of have had, and will continue to have, substantial anticompetitive effects in this district.  Finally, Plaintiff resides in this district.

## PARTIES

8.    Plaintiff Kiana F. Sarraf is a resident of Washington, DC.  During the Class Period, Plaintiff purchased Online Music and CDs indirectly from Defendants.

9.    Defendant Sony Corporation of America ("Sony") is a New York corporation with its principal place of business in New York, NY.  Sony is the U.S. subsidiary of Sony Corporation, which is based in Tokyo, Japan.

10.    Defendant Bertelsmann Music Group, Inc. ("Bertelsmann") is a Delaware corporation with its principle place of business located in New York, New York. Defendants Sony and Bertelsmann merged their U.S. music operations on or about August 2004.  As a result of the merger, all copyrights and licensing agreements of each defendant were transferred to Defendant Sony BMG Music Entertainment, Inc.

11.    Defendant Sony BMG Music Entertainment, ("BMG") is a joint venture between Sony and Bertelsmann.  Sony and Bertelsmann have equal ownership of BMG.

12.    Defendant EMI Group PLC ("EMI") is headquartered in London England. EMI operates throughout the United States and includes its affiliate, EMI Group North America, Inc., a Delaware Corporation.

13.    Defendant Warner Music Group Corp. ("Warner") is a Delaware corporation with its principal place of business located in New York, New York.

14.    Defendant Universal Music Group, Inc. ("Universal") is a Delaware corporation with its principal headquarters located in Santa Monica, California. Universal is a subsidiary of the French company Vivendi Universal.

**UNNAMED CO-CONSPIRATORS**

15.    The Recording Industry Association of America ("RIAA") is a trade association claiming to represent companies that "create, manufacture, and/or distribute approximately 90% of all legitimate sound recordings produced and sold in the United States." The RIAA lobbies on behalf of the music industry and frequently represents its members in litigation.  All of the Major Labels are members of the RIAA, directly and through their subsidiaries, and the Major Labels have control over the association by providing a majority of its budget and nominating the majority of its board of directors. The RIAA has conspired with the Major Labels and participated in the illegal activities described herein by providing the Major Labels with a form to exchange competitive information and to coordinate their scheme to fix and maintain royalty prices for online music.

16.    Various other persons, firms, corporations, or joint ventures not named as defendants herein, the identities of which are presently unknown, may have participated

as co-conspirators in the Major Labels' illegal activities by performing acts and making statements in furtherance of the illegal combination and conspiracy described herein.

## TRADE AND COMMERCE

17.     During all or part of the Class Period, each of the Defendants, itself or through its affiliates or subsidiaries, sold Online Music in a continuous and uninterrupted flow of intrastate and interstate commerce throughout the United States to Plaintiff and members of the Class.

## RELEVANT MARKET

18.     The relevant product markets are the market for Online Music and the market for CDs.  The relevant geographic market is the United States.

19.     At all relevant times herein, Defendants possessed a collective market share in the relevant product and geographic markets over 85%.

## FACTUAL ALLEGATIONS

20.     Defendants Sony, Universal, BMG, Warner, and EMI are music industry recording labels that collectively hold 85% of the copyrights in the recorded music industry.  As copyright holders, the Major Labels have the exclusive right to manufacture, sell, or otherwise distribute copies of that music in any form.  The other 15% of copyrights are held by independent labels, most of which use the Major Labels to distribute their music.

21.     For decades, the music industry organized around analog technology platforms due to the fact that the deterioration in quality upon subsequent reproductions of analog works acted as a natural impediment to content piracy.  The development of digital technology, however, removed the natural advantages afforded to copyright

owners by allowing perfect reproductions across unlimited generations and providing alternative channels of distribution which could not easily be controlled or monitored.

22.    Since the mid-1980s, the Major Labels have sold music in digital format on compact discs ("CDs"), on which they have enjoyed 30% to 40% profit margins, or about $5.00 profit per CD.

23.    Although the technology enabling the transfer of digital music over the internet has been available since at least 1994, the Major Labels used their substantial market power to impede the development of the market for Online Music in order to protect their profits in the CD market.

24.    In the late 1990s, MP3.com and Emusic (then called Goodnoise) requested licenses from the Major Labels to sell digital song downloads on the internet. Fearing that individual song downloads would undercut CD sales, the Major Labels refused these requests.

25.    In 1999, Napster exploded onto the internet using "peer-to-peer" file sharing architecture, which allowed users to open their computer's music library to the world. Napster served as a central directory to every user's hard drive, but permitted the uploading and downloading of music directly from user to user. In its first year alone, Napster had twenty million users. Other peer-to-peer file sharing services soon followed.

26.    Although the recording industry denounced music sharing as equivalent to theft, many users felt justified in using the service for a number of reasons. Users believed that the quality of new albums had decreased by the mid-1990s, with the typical bestselling album containing only one or two good songs bundled with many low-quality "filler" songs. Additionally, the price per track had greatly increased as an increase in the

6

overall price of CDs was coupled with a decrease in the number of tracks included with each CD. Finally, users praised the file sharing services because they enabled them to obtain hit songs without having to buy an entire album.

27.    What consumers embraced, the music industry loathed. The Major Labels were deeply entrenched in an existing business model of physical distribution and saw CD sales plummet as a result of internet file sharing services. While the Major Labels argued piracy to the public, they were really concerned about control over the promotion and distribution of music. They were not interested in redesigning a distribution business model that had been successful for nearly one hundred years.

28.    Beginning in 2000, the Major Labels, represented by the Recording Industry Association of America ("RIAA"), launched a three-pronged attack: (1) to shut down Napster and other file sharing services with copyright infringement lawsuits; (2) to obtain government support for the industry's battle against illegal online distribution of music; and (3) to sue file sharers. The unwritten corollary to this strategy was the Major Labels' refusal to authorize third parties to legally sell and distribute music online.

29.    In order to pacify critics and to wrest some control from Napster, the Major Labels started their own online services. These services, however, were ill-conceived and likely designed to fail in order to steer consumers back to CDs. These services were difficult for consumers to navigate and use and their expensive pricing of $2.50 to $3.50 per song turned off many early adopters of the service. Furthermore, users were actually only renting the tracks; after a certain point the files expired and could not be played again without repurchase. The services quickly failed. As one commentator

wrote, "consumers didn't care to pay $3 for a song wrapped in clunky security software ..."[1]

30.     In early 2001, in response to a threat by Congress to impose forced licensing, the Major Labels consolidated their catalogs into two non-overlapping joint ventures, MusicNet (Universal and Sony) and Pressplay (EMI, Warner, and BMG) to license music on the internet. This structure allowed the Major Labels to license their music to distribution companies they ran, thereby controlling the manner and pricing of music distribution over the internet. Other businesses wanting to sell digital music on the internet were required to enter into arrangements with MusicNet and Pressplay.

31.     In March 2001, the Antitrust Division of the United States Department of Justice ("DOJ") launched an investigation into MusicNet and Pressplay.

32.     It was immediately clear that MusicNet and Pressplay were designed to steer users back towards CD purchases. They refused to license for less than two dollars per song, and in some cases charged as much as $3.50 per song. One source reported that MusicNet refused to license to small entities, and in certain cases, required companies to make advance payments of as much as $750,000 before even entering into talks to license their music. Moreover, the licenses were for streaming and tethered downloads, thus precluding users from burning songs to CDs or transferring them to MP3 players.

33.     In July 2001, Napster shut down its entire network in order to comply with a preliminary injunction issued in the RIAA's copyright infringement lawsuit. On September 24, 2001, the case was partially settled. Napster agreed to pay music creators and copyright owners a $26 million settlement for past, unauthorized uses of music, as

---

[1] Michael Learmonth & Ronna Abramson, *In Digital Music, First You Must Eat Your Rival*, The Industry Standard, Aug. 6, 2001.

well as an advance against future licensing royalties of $10 million. In order to pay those

fees, Napster attempted to convert its free service to a subscription system.

34.    On October 10, 2001, Judge Patel of the United States District Court for

the Northern District of California heard oral arguments on the RIAA's request for

summary judgment in its copyright infringment case against Napster. Napster argued in

response that the agreements that the Major Labels had forged to create MusicNet and

Pressplay amounted to horizontal price-fixing combinations by setting wholesale and

possibly retail prices for their digitally distributed recordings. Judge Patel took these

allegations seriously, remarking, "I'm really confused as to why the plaintiffs came upon

this way of getting together in a joint venture. Even if it passes antitrust analysis, it looks

bad, sounds bad and smells bad."[2]

35.    Following Napster's allegations of price-fixing, the DOJ expanded its

investigation, calling for closed-door meetings with industry executives and sending out

civil investigative damands to the RIAA, MusicNet and Pressplay.

36.    Both MusicNet and Pressplay and their respective record label parent

submitted "White Papers" to the DOJ summaryizing their arguments as to why the DOJ's

concerns were unfounded. The Major Labels also provided the DOJ with documents

related to the joint ventures. As part of this production, Universal provided the DOJ with

a set of communication guidelines drafted by its lawyers, which were ostensibly intended

---

[2]  Peter Jan Honigsberg, *The Evolution and Revolution of Napster*, 36 U.S.F. L. Rev. 473, 482 (2001-2002). In her written opinion denying summary judgment, Judge Patel reiterated her concern about the antitrust implications of the joint ventures: "[E]ven a naif must realize that in forming and operating a joint venture, plaintiffs' representatives must necessarily meet and discuss pricing and licensing, raising the specter of possible antitrust violations. [citation omitted] These joint ventures bear the indicia of entites designed to allow plaintiffs to use their copyrights and extensive market-power to dominate the market for digital music distribution. [citation omitted] Even on the undeveloped record before the court, these joint ventures looks bad, sound bad and smells bad." *In re Napster, Inc. Copyright Litig.*, 191 F. Supp.2d 1087, 1109 (N.D. Cal. 2002).

to avoid antitrust violations by previenting Pressplay employees from discloing

competitively sensitive information to Pressplay's record label parents.

37.    Napster's argument and the responses of Judge Patel and the DOJ

apparently alarmed the Major Labels enough to cause a sudden paradigm shift.  In July

2002, Listen.com became the first online company to secure licenses from each of the

Major Labels.  Most of the music available on Listen.com, however, could only be

listened to in streaming format, and not burned to CDs.

38.    In April 2003, Apple announced that it had negotiated licensing deals with

the Major Labels and thousands of independent labels.  Apple's iTunes Music Store

finally provided consumers "Napster-like" access to online music—songs could be

quickly and easily downloaded without a subscription for 99 cents per song or $9.99 for

an album.  iTunes users quickly racked up one million sales in the iTunes Music Store in

the first week of business.  By October 2003, Apple had sold 14 million legal downloads,

making it the most successful legal Online Music Retailer in the world.

39.    With the proven success of iTunes, the Major Labels began licensing their

content to a wide number of Online Music Retailers in the United States and abroad,

removing many restrictive music licensing terms from their agreements, and allowing

Online Music Retailers to deliver the music in a number of different formats and terms.

40.    As the Online Music Retailers exploded, Sony and Universal sold

Pressplay to Roxio, an independent software company that absorbed Pressplay into its

legal version of Napster.

41.    In December 2003, the DOJ announced the closing of its investigation of

MusicNet and Pressplay.  The DOJ concluded:

> The Division's investigation of the licensing by the major
> record lables revealed no evidence that the major labels
> impermissibly established the terms on which they licensed
> their music to third parties.  Not only did the terms of the
> licenses that the major labels granted to third parties vary
> significantly, but it is also apparent that each lable adopted
> its own approach toward the distribution of its music by
> third parties over the Internet.  Safeguards adopted by both
> pressplay and MusicNet to prevent the sharing of
> confidnetial information among their participants also
> appear to have succeeded in previentin the inappropriate
> exchange of information amon the major record labels
> through the medium of the joint ventures.

42.    With respect to the alleged attempt to suppress the growth of internet-based music distribution, the DOJ noted that the "poor quality and restrive nature" of the services "provided some support" for the theory that the Major Labels were attempting to "impeded the growth of the Internet" for music distribution.  Nevertheless, the DOJ concluded that the Major Lables had in fact granted licenses to other online music distribution services, and that the market for Online Music had continued to develop despite the Major Labels' participation in the joint ventures.

43.    The DOJ's findings were a near-verbatim recitation of the arguments advanced in the two White Papers.  For example, with respect to variation in licensing terms, the Pressplay White Paper states:

> The absence of spillovers [of licensing information] is
> demonstrated conclusively by the wide dispersion between
> the terms of [Sony's] licenses with third party services, the
> terms of [Universal's] licenses with thir dparty services,
> and the terms of pressplay's agreements with [Sony],
> [Universal], and third party licensors.

*In re Napster Copyright Litig.*, No. MDL-00-1369, 4 (N.D. Cal. April 21, 2006) (quoting Pressplay White Paper) (slip opinion at docket # 886).

44.     With respect to firewalls, the Pressplay White Paper states that "both of the parent labels, as well as pressplay, have established and adhered to durable and effective firewall arrangements to prevent such spillover." *Id.* (quoting Pressplay White Paper). Similarly, the MusicNet White paper states that "MusicNet purposefully put safeguards in place to prevent exchanges of information, or other conduct, that could negatively affect competition. MusicNet is not aware of any breaches of these safeguards." *Id.* (quoting MusicNet White Paper).

45.     Information contained in the White Papers was highly misleading if not entirely false. For example, despite the assertions to the contrary, competitively sensitive information was exchanged through the joint ventures.

46.     Additionally, there is limited if any variation in licensing terms of the Major Labels because each of the Major Labels mandates most favored nation clauses ("MFN clauses") in their licensing agreements with the Online Music Retailers. Such clauses guarantee that if one of the Major Labels negotiates a better rate with one of the services, the others will see corresponding rate hikes.

47.     In other words, if one of the Major Labels was to negotiate a royalty price of 65 cents, and another Major Label was to subsequently negotiate a royalty price of 68 cents, the first Major Label could invoke the MFN clause to raise its price to 68 cents.

48.     MFN clauses are a means of collusion by the Major Labels. They create transparency by which each knows the terms their competitors are getting because they are the same as their own. Because the clauses forbid the Major Labels from receiving worse terms than their competitors, the clauses fix prices and restrict competition.

49.     In some cases, the MFN clauses allow the Major Labels to audit the terms of deals the Online Music Retailers have with other record companies to ensure that the Major Labels are receiving the highest pricing terms possible.

50.     The White Papers submitted to the DOJ during its investigation omit any mention of MFN clauses. The use of MFN clauses is fundamentally incompatible with assertions in the White Papers that the licenses granted by the Major Labels show a variation of terms.

51.     The music industry's own market research indicates that the average consumer would be attracted to legal Online Music, as opposed to music piracy, at a price of 25 cents per download. The 25 cents figure allows the Major Labels about 10 cents of profit per download.

52.     Instead, royalty rates have been collectively set at approximately 65 cents per download through the use of MFN clauses, translating to a 99 cent retail price. A price of 99 cents per song is roughly the same as, or slightly higher than, the cost per song on a CD. This price ensures that the Major Labels will earn supra-competitive royalties on Online Music and also ensures consumers are unlikely to be lured away from CDs, thereby enabling the Major Labels to maintain supra-competitive prices on CDs as well.

53.     The music market has change dramatically since the DOJ closed its investigation in 2003. Although consumers are buying fewer CDs, Online Music sales have soared. Sales of digital tracks more than doubled in 2005, climbing to 352 million. Perhaps most telling is that since 2002, revenues have only dropped by $340 million— about 2.7%.

13

54.     In December 2005, the Attorney General of the State of New York launched in investigation into whether the Online Music pricing practices of industry participants violate federal and state antitrust laws.

55.     In March 2006, the United States Department of Justice similarly launched an investigation into the possibility of anticompetitive practices in the music-download industry.

56.     In an April 21, 2006 opinion in the Napster copyright litigation, Judge Patel concluded that claims in the White Papers submitted during the earlier DOJ investigation regarding variations in the licensing terms among the Major Labels and the firewalls between the joint ventures and the Major Labels were deliberately misleading, if not completely false. *In re Napster Copyright Litig.*, No. MDL-00-1369 slip opinion at 4, 10, 11.

57.     Thus, notwithstanding the DOJ's earlier conclusions, the Major Labels have conspired to delay the development of an online market and to fix, raise, and maintain prices in both the Online Music market and the CD market.

## INJURY TO PLAINTIFF AND THE CLASS

58.     Plaintiff and the Class have been injured as a direct, foreseeable and proximate result of Defendants' misconduct alleged herein. Plaintiff and Class purchased Online Music from Online Music Retailers who were forced to pay supra-competitive royalty prices, which were passed on to Plaintiff and the Class. Such injury would not have occurred but for Defendants' conduct alleged herein.

## THE INTEREST OF THE GENERAL PUBLIC

59.    Defendants have fixed, raised, and maintained the royalty rates passed on to purchasers of Online Music and CDs.

60.    Because Plaintiff has reason to believe that Defendants have engaged in, and will continue to engage in the unlawful practices set forth herein, she, on behalf of the General Public of the District of Columbia, has reason to believe that Defendants have caused, and will continue to cause damage and adverse effects to the General Public of the District of Columbia. For these reasons, Plaintiff acts for the benefit of the General Public of the District of Columbia.

## CLASS ACTION ALLEGATIONS

61.    The Class Period is from April 27, 2002 to the present.

62.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(b) on behalf of a Class defined as:

> Nationwide Class
> All persons or entities residing in the United States that purchased, not for resale, Online Music and/or CDs produced, manufactured, licensed, distributed, and/or sold by Defendants between April 27, 2002 and the present. Excluded are Defendants and any unnamed co-conspirators, as well as their parents, subsidiaries, affiliates, officers, directors and employees.

63.    The Class includes two sub-classes as follows:

> Online Music Damages Sub-Class
> All persons or entities residing in the Indirect Purchaser States that purchased, not for resale, Online Music produced, manufactured, licensed, distributed, and/or sold by Defendants between April 27, 2002 and the present. Excluded are Defendants and any unnamed co-conspirators, as well as their parents, subsidiaries, affiliates, officers, directors and employees.

> CD Damages Sub-Class

> All persons or entities residing in the Indirect Purchaser
> States that purchased, not for resale, CDs produced,
> manufactured, licensed, distributed, and/or sold by
> Defendants between April 27, 2002 and the present.
> Excluded are Defendants and any unnamed co-
> conspirators, as well as their parents, subsidiaries, affiliates,
> officers, directors and employees.

"Indirect Purchaser States" refers to Arizona, California, District of Columbia, Florida,

Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New

Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, West

Virginia, and Wisconsin.

64.    The Class is so numerous that joinder of all members is impracticable.

There are thousands of members in the Classes who are geographically dispersed

throughout the United States.

65.    Plaintiff's claims are typical of the claims of the members of the Class

because Plaintiff and all Class members were damaged by the same wrongful conduct of

the Defendants alleged herein.

66.    There are questions of law and fact common to the Class which

predominate over any questions affecting only individual Class members.  Such common

questions include:

   a.    Whether Defendants have engaged in a continuing combination
         and conspiracy to fix and maintain prices in the relevant market;

   b.    The duration and extent of any such combination or conspiracy
         alleged herein;

   c.    Whether Defendants and each of them were participants in any
         such combination or conspiracy alleged herein;

16

    d.      Whether Defendants fixed prices in the relevant markets at supra-competitive levels;

    e.      Whether Defendants' conduct caused damage to Plaintiff and members of the Class, and if so, the appropriate measure of such damages.

67.    The claims of the Plaintiff are typical of the claims of the Class, and Plaintiff has no interest adverse to the interests of other members of the Class.

68.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced and competent in the prosecution of complex class actions and antitrust litigation.

69.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford to individually litigate an antitrust claim against large corporate Defendants. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of the controversy.

70.    Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Classes as a whole.

## COUNT I
### (Violation of Section 1 of the Sherman Act, 15 U.S.C. §1)

71.      Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

72.      This Count is alleged against all Defendants on behalf of the Class.

73.      Defendants' conduct as alleged herein violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

74.      Defendants, together with their co-conspirators, conspired to delay and impede the creation of on Online Music market, as described herein, in order to protect their profits in the CD market.

75.      Once Defendants were no longer able to forestall competition in the Online Music market, they conspired to restrain trade in the market for Online Music by agreeing to fix, raise, maintain, or stabilize prices for Online Music.  The supra-competitive prices maintained in the Online Music market had the dual effect of allowing Defendants to maintain supra-competitive prices in the CD market.

76.      Plaintiff and members of the Class have been injured and continue to be injured in their business and property by reason of Defendants' unlawful acts alleged in this Count.  Their injury consists of paying higher prices for Online Music and CDs than they would have paid in the absence of Defendants' conduct.  This injury is of the type the above statute was designed to prevent and directly results from Defendants' unlawful conduct.

77.      Plaintiff and the Class are entitled to equitable and injunctive relief to prevent Defendants' continuing unlawful conduct.

### COUNT II

**(Violation of the Antitrust Statutes of the Indirect Purchaser States)**

78.     Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

79.     This Count is alleged against all Defendants on behalf of the Online Music Damages Sub-Class and the CD Damages Sub-Class.

80.     By reason of the foregoing, Defendants have violated District of Columbia Code §28-4501 *et seq*.

81.     By reason of the foregoing, Defendants have also violated the antitrust laws of the states of Arizona, California, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, and Wisconsin.

82.     Class members in each of the states listed above paid supra-competitive prices for Online Music and CDs purchased indirectly from Defendants, and as a result, have been injured because of Defendants' wrongful and collusive conduct regarding royalty prices.

83.     Plaintiff and the Class hereby seek actual damages for their injuries caused by the aforementioned violations in an amount to be determined at trial. Plaintiff and the Class further seek treble damages reasonable attorneys' fees, and costs under the state antitrust laws where allowed.

## COUNT III
**(Violation of the District of Columbia Consumer Protection Procedures Act)**

84.     Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

85.     This Count is alleged against all Defendants on behalf of the General Public of the District of Columbia pursuant to District of Columbia Code §28-3905(k)(1).

86.     By reason of the foregoing, Defendants have violated District of Columbia Code § 28-3904.

87.     Plaintiff and the General Public of the District of Columbia hereby seek treble damages or statutory damages in the amount of $1,500 per violation, whichever is greater, pursuant to D.C. Code § 28-3905(k)(1).  Plaintiffs and the General Public of the District of Columbia further seek reasonable attorneys' fees and costs.

<u>COUNT IV</u>
**(Unjust Enrichment)**

88.     Plaintiff incorporates and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

89.     This Count is alleged against all Defendants on behalf of the Class.

90.     Defendants' conduct has resulted in Plaintiff and the Class paying supra-competitive prices for Online Music and CDs.  Allowing Defendants to retain a financial windfall generated by collusion and anticompetitive conduct would be unjust and inequitable.  Such gains resulted directly from overpayments made by Plaintiff and Class, thus they are entitled to a return of these overpayments stemming from the willful and knowing conduct of the Defendants.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an Order setting forth the following:

a) certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as the representatives of the Class, and designating her counsel as counsel for the Class;

b) declaring that Defendants' conduct is in violation of Section 1 of the Sherman Act;

c) declaring that Defendants' conduct is in violation of antitrust statutes in the Indirect Purchaser States;

d) declaring that Defendants' conduct is in violation of the D.C. Consumer Protection Procedures Act;

e) granting Plaintiff and the Sub-Classes damages as permitted by law;

f) granting Plaintiff and the General Public of the District of Columbia treble damages or statutory damages in the amount of $1,500, whichever is greater;

g) granting Plaintiff and the Class their costs of prosecuting this action, together with interest and attorneys' fees, including such as allowed by statute, experts' fees and costs; and

h) granting such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the members of the Class, hereby demands trial by jury on all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

DATED: April 27, 2006                    FINKELSTEIN THOMPSON & LOUGHRAN

Douglas G. Thompson (DC Bar #464227)
Mila F. Bartos (DC Bar #172387)
Tracy D. Rezvani (DC Bar # 464293)
Hilary K. Ratway (DC Bar #481465)
1050 30th Street NW
Washington, DC 20007
Tel: 202-337-8000
Fax: 202-337-8090

22